## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cr-202-13 |
| | ) | |
| RONALD LYNN DORSEY | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## RONALD DORSEY'S POSITION ON SENTENCING

Ronald Dorsey has an associate's degree in biology and a solid work history – since the age of seven. In fact, when law enforcement placed a GPS tracker on his vehicle, it simply showed him going to work. Before this case Mr. Dorsey had never spent even a night in jail. He has now been incarcerated for over a year. This significant punishment has already achieved its intended effect. No more is warranted. Mr. Dorsey has felt acutely the gut-wrenching shame and guilt of letting down his family and especially his daughter with whom he used to spend almost every afternoon. He lost a good job, the trust of supervisors, respect of his family, and has agonized over his prolonged absence from his daughter's life. Recognizing this is not the life for him, Ronald Dorsey has done everything within his power to ensure he is a better man upon his release.

The D.C. jail is not an easy place to thrive. Yet Mr. Dorsey has done just that. Rather than sliding into self-pity, or blame others for his circumstances, Mr. Dorsey accepted responsibility for his wrongdoing and used what little means he has – his intellect and strong work ethic – to reach the uppermost limits of opportunities at the D.C. jail to become a successful Georgetown University student and a member of the debate team. To do this he has had to rise above jeering and contempt from other inmates, turn the other cheek to unfair, even bullying-type, authorities, and maintain unwavering perseverance and grit with his eyes looking only forward. In addition to his school and debate team, Mr. Dorsey was accepted into the mentorship program, the plumbing apprenticeship, and he has a job that requires waking at 5:00 a.m. to start setting out trays for the jail meals. Thus, Mr. Dorsey begins his day working at 5:00 a.m., he then attends classes, followed by studying and completing coursework, any other programing at the jail, until he finally lays down to rest only to begin it all again at the early hour the following day. It is a humble, yet laudable existence.

That Mr. Dorsey has been able to succeed in this environment fraught with easy pitfalls and a group of men who may never break free from the carceral cycle, speaks to his ability to continue this upward trajectory on the outside. Further incarceration only stifles this momentum, distances his family support, and increases his risk of feeling hopeless. Mr. Dorsey's

actions for the past year have shown he has learned his lesson, has figured out how to navigate difficult environments, and that he has the fortitude to do it.

With his impressive work history, commendable educational achievements, and close family relationship, Mr. Dorsey is neither the average inmate nor the average defendant. Mr. Dorsey is unique among many who come before the Court entangled in a drug conspiracy. Moreover, the substantive conduct in which he engaged did not involve fentanyl, violence, or even a firearm.

Based on these reasons, as well all of the 18 U.S.C. § 3553(a) factors, a sentence of time-served with the maximum amount of supervised release (three years) to include 200 hours of community service is sufficient but not greater than necessary to achieve the goals of sentencing. Such a sentence will allow the Court to retain authority over Mr. Dorsey, still constitutes significant punishment, achieves deterrence, and allows Mr. Dorsey the highest chance of success.

## OBJECTIONS TO THE PRESENTENCE REPORT

Mr. Dorsey has reviewed the Presentence Report. He has no objection to the offense level calculation. Mr. Dorsey submits that a departure to criminal history category I is warranted because his prior 2014 offense of possession of marijuana in Richmond, Virginia (when he was 20 years old – he is now 30) is no longer a criminal offense in Virginia (or in Washington,

DC). Thus, although today this same conduct would not even result in an arrest, let alone a conviction, for Mr. Dorsey this conviction nets him one criminal point, resulting in two total points and placing him in category II.

The United States Sentencing Guidelines contemplate a scenario such as this. Section 4A1.3, Application Note 3 states "A downward departure from the defendant's criminal history category may be warranted based on any of the following circumstances… The defendant received criminal history points from a sentence for possession of marihuana for personal use, without an intent to sell or distribute it to another person." *See also United States v. Nelson*, 166 F. Supp. 2d 1091, 1097 (E.D. Va. 2001)(departing from criminal history category VI to category III because VI overstates the defendants criminal history noting that "[t]he bulk of Defendant's offenses consisted of traffic infractions. Defendant also received convictions for possession of marijuana."); *United States v. Wilkes*, 130 F. Supp. 2d 222, 239 (D. Mass. 2001)("Wilkes' criminal history score derives from two convictions for minor drug offenses….Wilkes was arrested at a rock concert for possession of marijuana and dangerous drugs (psilocybin). … Wilkes was also convicted of possession of under fifty grams of marijuana …after being arrested for possessing a marijuana cigarette. … Wilkes' minor criminal record paints a picture of the typical Category I offender, not a Category III offender.").

The probation office counters this argument by highlighting Mr. Dorsey's Youth Act marijuana offense that was expunged and suggests it

4

could be considered for an upward departure. *See* ¶177b. Yet, while the downward departure provisions contain as an example of applicability a description of the very conduct used to increase Mr. Dorsey's criminal history score, the upward departure guidance provides no such apt instruction. In fact, the examples of what may constitute grounds for an upward departure list far more serious offenses, including "a prior consolidated sentence of ten years for a series of serious assaults" and "large scale fraudulent misconduct." *See* §4A1.3, Application Notes 2 and 3. Mr. Dorsey's Youth Act charge for distribution of marijuana hardly parallels these examples of when a departure may be appropriate. This Court should exercise the authority specifically contemplated in §4A1.3, Application note 3 and depart downward to criminal history category I, resulting in a guidelines range of 37-46 months.

Mr. Dorsey also objects to standard condition of supervision number 12. As worded, is unconstitutionally vague, and an improper delegation to the probation officer. *See, e.g., United States v. Van Donk*, 961 F.3d 314, 323–24 (4th Cir. 2020) ("[a] condition of supervised release is unconstitutionally vague if it doesn't give a probationer "fair notice of the conduct that it punishes" or is "so standardless that it invites arbitrary enforcement."); *United States v. Shiraz*, 784 F. App'x 141, 143-44 (4th Cir. 2019) (court's delegation to probation officer of what type of business defendant could operate was improper).

Mr. Dorsey would not object to a modified Standard Instruction Number 12: "If *the Court* determines in consultation with the probation officer that, based on the criminal record, personal history, and characteristics, and the nature and circumstances of the offense, that the defendant poses a risk of committing further crimes against another person, including an organization, the probation officer may require the defendant to notify the person about the risk, and he must comply with that instruction. The probation officer may contact the person and confirm that the defendant has notified the person about the risk." *See e.g. United States v. Andrus*, 1:20-cr-0134, Dkt. 76, pg. 5 (E.D.Va. 10/27/21)(District Court modifying the instruction to this language).

## ARGUMENT

### I.    Legal standard

The overriding principle and basic mandate of 18 U.S.C. § 3553(a) requires district courts to consider a number of factors in order to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing as set forth in the statute.[1]  The Guideline range, as one of many factors, is not binding.  The Supreme Court has held that a

---

[1] These factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guidelines range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

defendant's Guideline range is truly advisory and that this Court is free to impose a sentence below the range.  *See, e.g., Gall v. United States*, 128 S. Ct. 586, 602 (2007) ("the Guidelines are only one of the factors to be considered when imposing sentence"); *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (noting that, after consideration of § 3553(a) factors and the "sufficient but not greater than necessary" requirement, a sentencing court may find that the case falls outside of the "heartland" contemplated by Guidelines, or that "the Guideline sentence itself fails properly to reflect § 3553(a) considerations," or that "the case warrants a different sentence regardless").

## II.   A sentence of time-served with three supervised release to include 200 hours of community service is sufficient but not greater than necessary to achieve the goals of sentencing.

### A.   Personal history and characteristics of Mr. Dorsey

Both of Mr. Dorsey's parents died before Mr. Dorsey was twelve years old. When Mr. Dorsey was one, his father was killed by his best friend. The friend walked up to their house and just shot him. The friend was never charged until he admitted to the killing thirteen years later and was then incarcerated. Before his death, Mr. Dorsey's father had been a delivery truck driver.

Mr. Dorsey's mother was unemployed and was addicted to drugs, mostly PCP. Thus, Mr. Dorsey primarily lived with his great grandmother and great aunt growing up, although he spent the summers with his mother. When Mr. Dorsey was eleven, his mother died suddenly of a heart attack. She

was pregnant at that time and the medical professionals tried to save her baby, but the baby only survived for four days.

Although Mr. Dorsey had his basic needs met as a child, the neighborhood where he was raised was still rough. He witnessed shootings, drug dealing, and was later even shot himself. He attended public elementary and middle schools in the area. In high school Mr. Dorsey was granted a football scholarship to a private Catholic school where he attended 9th grade. Unfortunately, he did not keep up with his academics and could not continue there. For his remaining high school years he attended Coolidge high school where he excelled. He played football and graduated on time with a 3.5 GPA.



After high school Mr. Dorsey immediately went to Virginia Union University and obtained an associates degree in biology. He paid tuition with

the help of his great aunt, student loans, and a grant. After graduating he got an apartment with his then girlfriend who was pregnant with their daughter. While driving one day around that time, with his then girlfriend who was pregnant, somone pulled up next to him at a stop light and just shot him in the shoulder. To this day he does not know who the person is, or why they would have shot at him. Mr. Dorsey thinks it is likely a misidentification or being caught in crossfire. He was able to drive himself to the hospital where he immediately underwent surgery. The surgery was mostly successful except for remnants that lodged in his back. Unfortunately, this surgery led to a multi-year addiction to oxycodone. However, after a long struggle realizing this was not the life he wanted to live, Mr. Dorsey was able to stop using oxycodone on his own volition. Mr. Dorsey and his daughter's mother were together for one year before separating. They still maintain a good relationship and, before his arrest, had been working together to raise their daughter.

Mr. Dorsey's daughter is everything to him. All that he strives for is all for his daughter. Until his incarceration, Mr. Dorsey had never missed a cheerleading event or school function. He spent almost every afternoon and weekend with her. They were exceptionally close:






That is why, when he tried so hard to keep the fact of his incarceration
from her, and she asked about it while on the phone with him in the innocent
way only a seven-year-old can, it crushed him. It brought him to his knees.
He was a grown man in a crowded room at the D.C. jail sobbing

uncontrollably, having disappointed his child and hearing that disappointment in her voice. While many defendants may come before the Court missing their families, the genuine anguish and remorse in Mr. Dorsey's voice in the jail call (Def. Ex. 3) is tangible evidence of his distress, the deep punishment already inflicted upon him, and his sincere regret.

Mr. Dorsey did not just exhibit dedication to his daughter, he also has a remarkable work ethic. Both his great-grandmother and great-aunt noted his employment beginning at the age of seven when started working at a steak house to help support his family. *See* Def.'s Ex. 2. From there, his efforts only grew. He worked as a lifeguard, retail clerk, and for seven years, from 2016 to 2023, he worked the grounds of Glenwood cemetery.

There he didn't just do the minimum, he excelled. Mr. Dorsey was "one of [their] best employees." *Id.* He motivated his co-workers, and displayed genuine compassion for the clients there who had suffered a loss. The manager of the cemetery wrote that Mr. Dorsey was dependable, responsible, honest, and courteous, and that it was an honor to write a letter of support for him. *See id.* Mr. Dorsey's direct supervisor, the grounds manager, expressed similar sentiments, explaining that Mr. Dorsey was a diligent, motivated employee who spoke often about his desire to help his family, particularly his daughter. *See id.* In short, not only does Mr. Dorsey have the skills and the commitment necessary to be successful in future endeavors, he has exhibited those qualities in the past, and for many years. He veered from

the correct path, as he acknowledges, but with a stable work history and supportive references, Mr. Dorsey's prospects of being able to return to that productive, law abiding life are high.

Others in the community know Mr. Dorsey as a hardworking family man as well. Charles Foreman, the owner of Everyday Sundae, wrote a letter on Mr. Dorsey's behalf. His letter is remarkable because he is not someone who was introduced to Mr. Dorsey as a family friend, an acquaintance, or through any other connection that could give Mr. Foreman predisposition to favor Mr. Dorsey. Instead, Mr. Foreman met Mr. Dorsey completely independently and organically when he first opened his ice cream shop in the neighborhood. Through frequenting his shop over the years, watching Mr. Dorsey interact with others, and through his own interactions with him, Mr. Foreman has become so impressed with Mr. Dorsey that he writes that Mr. Dorsey has had "a profound effect on the life of my son, and myself." *See* Def.'s Ex. 2. He notes that initially Mr. Dorsey made him feel welcome "and stood to gain nothing by showing himself to be friendly to me." *Id.* As the two became more well acquainted he witnessed that Mr. Dorsey was respected by others in the community, helped neighbors he does not know, and was a good father and friend. *Id.* Mr. Dorsey is so much more than the offense he committed.

In addition to the work and education at the D.C. jail, Mr. Dorsey has spent the past year engaged in self-reflection. He has acknowledged his

wrongdoing, expressed remorse, and has concrete plans to ensure a better future. He wrote to the Court:

> My involement in dealing with drugs and fast money making routes are over and is a decision I learn to deeply regret. I admit I was wrong and selfish to myself, my family and my community. As a man I also admit those poor decisions were mine and even though I may list many reasons why I made those decisions I rather keep my excuses to my self and accept full responsibility.

He described his future plans:

> I plan to finish school and become a leading mentor to the youth in my community. Youth mentoring is one of the most popular forms of volunteering in the world. I want and plan to prioritize more on building emotional bonds between mentors and mentees. Focusing more on developing specific social, emotional, and intellectual skills.

...

> I want to bring more mentorship opportunities into my community, into schools, youth sports and other organizations which will spark meaningful change to me. I want to focus my help on spending my time on coaching youth football and connecting with young men heading down the wrong path by connecting with them mentally. I know my impact on the youth and I know change is yet to come. I plan on getting back on track with my career work and most importantly getting back to being the best father I can possible be.

### B.      Nature of the offense

Mr. Dorsey's offense was a nonviolent offense. He also was not involved with fentanyl nor did he possess a firearm. Although the indictment against him focused on drug trafficking, at the time Mr. Dorsey was arrested he had begun distancing himself from this type of activity and from this group of people. Instead, as he has acknowledged in the statement of facts, Mr. Dorsey was more engaged in illicit collection of covid-relief funds. It does not make it right, and undoubtedly is still criminal, but it shows that Mr. Dorsey was already disentangling himself from this group and their more dangerous endeavors. Mr. Dorsey knows what he did was wrong, he accepted responsibility and in fact, disclosed the full extent of his conduct with respect to the covid-relief funds, including funds about which the government was not previously aware.

### C.      The need to avoid unwarranted sentencing disparities

The Judiciary Sentencing Information (JSIN) result for a defendant sentenced under §2S1.1 with an offense level of 21 and criminal history category score of II and a guidelines range of 41-51 months shows that the average sentence imposed was 27 months and the median sentence imposed was 33 months.[2] *See* Def.'s Ex. 4. This data *excludes* all defendants who

---

[2] The alternative JSIN average at 29 months and a median range of 36 is misleading. This increased calculation is because the "Sentence Length Data" is not included in that calculation. Without the "Sentence Length Data" box checked, the result fails to include defendants who were sentenced to no imprisonment.

received a 5K1.1 substantial assistance departure. Therefore, the actual number may be lower.

With a departure to criminal category I, as Mr. Dorsey should be since his prior Virginia conviction for possession of marijuana is no longer a criminal offense in Virginia, the JSIN sentencing data shows the average sentence imposed was 23 months and the median sentence imposed was 24 months.

Regardless of the criminal history score, or the inclusion of "sentence length data," it is clear is that a sentence within either calculated guidelines range, or even close to the calculated guidelines would be significantly above the average sentence received by others sentenced under the same guidelines section with the same offense level and criminal history scores. In keeping with 18 U.S.C. §3553(a)'s mandate to avoid unwarranted sentencing disparities, this Court should sentence Mr. Dorsey well below the calculated guidelines range. A sentence of time-served with three years of supervision and 200 hours of community service properly accounts for the average sentences of other similarly situated defendants as well as the additional mitigating factors present in Mr. Dorsey's case.

This would account for disparities within Mr. Dorsey's case as well. Defendant, Anthony Bailey, was a member of this same group. As opposed to Mr. Dorsey who held steady employment and was GPS tracked going to work, the government described Anthony Bailey's "day-job" as "conducting his

regular hand to-hand drug transactions." *Gov't Sent. Memo for Anthony Bailey*, ECF No. 228 at 2. The government showed that Anthony Bailey coordinated with high-ranking KDY members to report on activity and security of KDY territory and used a common KDY expression, YNV which stands for "young and violent." *Id.* at 3-4. Perhaps more importantly, when law enforcement executed an initial search warrant on Anthony Bailey's residence in March 2021 (one of the two stash houses mentioned in the PSR) two other KDY members were also located there and officers recovered five firearms, (including one "ghost gun," *see Gov't Sent. Memo for Antonio Bailey*, ECF No. 157 at 2) one of which was in Anthony Bailey's bedroom. Anthony Bailey later admitted that this firearm (not the ghost gun) was his and was possessed in connection with his drug trafficking in the Kennedy Street Corridor. *See Anthony Bailey Statement of Offense*, ECF No. 179 at 3-4. When a second search warrant was executed in July 2021, the same individuals were there and officers found more firearms as well as marijuana and crack cocaine. When Anthony Bailey was arrested in June 2023, the search of the residence revealed a different firearm located in Anthony Baily's bedroom. In other words, Anthony Bailey possessed at least two firearms while drug dealing, had numerous firearms in his residences, and lived in a stash house. He received a sentenced of 15 months.

Similarly, Antonio Bailey had his residence (the same stash house) searched twice where many firearms were located, and two of them in his

bedroom. *See Gov't Sent. Memo for Antonio Bailey*, ECF No. 157 at 2-3. Antonio Bailey had both of these firearms while he was under felony indictment for drug distribution in D.C. Superior Court. *See Antonio Bailey Statement of Offense*, ECF No. 120 at 2. Antonio Bailey's arrest record includes six drug-related offenses and two firearms offenses, not including the numerous firearms located in this case, and he was a criminal history category II. *See* ECF No. 157 at 5. He received a sentence of 24 months

Likewise, Herman Sigou had a firearm equipped with a high-capcity magazine in his bedroom during the first search of his residence, which he later admitted was used in connection with his drug trafficking. *See Herman Signou Statement of Offense*, ECF No. 151 at 3. In another incident, after K-9s alerted to some of Signou's luggage at an airport, he and another defendant evaded law enforcement and left with at least two pieces of luggage. Law enforcement followed them to a different stash house, obtained a search warrant, and searched the residence that same day. The search revealed at least five members of KDY, ten firearms, including *two machine guns*, assorted ammunition, marijuana and fentanyl. *See id.* at 4; *Gov't Sentencing Memo for Herman Signou*, ECF No. 217 at 5. He received a sentence of 40 months.

Contrast these defendants' conduct with Mr. Dorsey's. Mr. Dorsey's "day-job" was never purported to be drug dealing. He is not alleged to have possessed any firearms in connection with drug dealing, and certainly not a

machine gun, nor is he ever alleged to have dealt fentanyl. In fact, the search of Mr. Dorsey's residence turned up no drugs, no firearms, and no other KDY members. In other words, the Baileys' and Sigou's conduct; full-time armed drug dealing (and possibly with a machine gun) is far more dangerous than Mr. Dorsey's conduct of sporadic unarmed drug dealing and money laundering.

Moreover, Anthony Bailey was arguably exposed to two §924(c) charges with a stacking mandatory minimum totaling ten years, and Antonio Bailey and Signou, at least one 5-year mandatory minimum §924(c) each. Instead, they were spared those mandatory minimum charges and sentenced to considerably lower terms of imprisonment.

While the government may try to argue that handling the money or traveling side of drug dealing is just as serious because it enables the other defendants' activity, and therefore requires additional incarceration, such an assertion fails. Significant distinctions in the substantive conduct exist regardless of where the funnel ends. For example, the Chiquita banana company funded far worse, and the Department of Justice was satisfied with a non-custodial sentence. Chiquita banana made payments amounting to more than $1.7 million to a violent foreign terrorist organization in Columbia who, at its height, engaged in intimidation, drug trafficking, extortion, forced displacements, killings, and brutal attacks on villagers. Chiquita banana entered into a criminal plea agreement with the Department of Justice for

five years' probation and fine. *See* Dep't of Justice Press Release, *Chiquita Brands International Pleads Guilty to Making Payments to a Designated Terrorist Organization And Agrees to Pay $25 Million Fine* (March 19, 2007);[3] Vanessa Buschschlüter, *Banana giant held liable for funding paramilitaries*, BBC (June 11, 2024).[4]

Thus, regardless of the ultimate end point, Mr. Dorsey's substantive conduct is distinct from the other co-defendants referenced in this case. The substantive conduct attributable to him is simply not as dangerous a crime as full-time armed drug dealing with stash houses and numerous firearms including ghost guns and machine guns. Neither Mr. Dorsey's residence nor his vehicle contained a firearm. Regardless of the way in which the government intends to characterize Mr. Dorsey's involvement, it is an empirical fact that there was less chance of someone being physically injured around Mr. Dorsey than any of these other armed drug dealers referenced above. His sentence should reflect this lower level of dangerousness. Sentencing him to a period of incarceration higher than the Baileys would create an unwarranted disparity.

### D.   Flaws in the fraud guidelines

Perhaps one of the reasons the average sentence for a person sentenced under the same guidelines section with the same offense level and criminal history score is so far below that range is because Courts have

---

[3] https://www.justice.gov/archive/opa/pr/2007/March/07_nsd_161.html
[4] https://www.bbc.com/news/articles/c6pprpd3x96o

recognized some of the flaws in the fraud guidelines. Mr. Dorsey's guidelines range is calculated under the 2S1.1, the money laundering section. The amount of "loss" primarily determines the offense level for fraud offenders. In this case it adds an additional eight levels to Mr. Dorsey's guidelines range. However, loss is an extremely imperfect gauge as to the seriousness of the offense. *See United States v. Gupta*, 904 F.Supp.2d 349 (S.D.N.Y. Oct. 24, 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, see 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The amount of loss is "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004).

"An amount of loss… does not tell us anything about why the defendant committed the offense or how much he personally benefited. These motive-based facts are important for issues of retribution, deterrence, and the need for incapacitation." David Debold & Matthew Benjamin, *"Losing Ground"—In Search of a Remedy for the Overemphasis on Loss and Other*

*Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. Pa.L.Rev. PENNumbra 141, 152 (2011).  A former staff attorney at the U.S. Sentencing Commission wrote, "[D]ecreasing the now-central role loss has in sentencing economic crimes is imperative….  Until then, courts and practitioners are well advised to look critically, and indeed skeptically, on the sentencing advice given by the Guidelines that are influenced by loss."  Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, Federal Sentencing Reporter 26 (2013).

In Mr. Dorsey's case, the heavy reliance on loss amount does not account for any of his rehabilitative efforts while incarcerated, his motivation or background, and all of the collateral consequences he has already suffered as a result of his conduct. Indeed, the only characteristics factored into the guidelines calculation for Mr. Dorsey other than acceptance of responsibility are negative factors.

Additionally, many of the enhancements in the fraud guidelines are cumulative. Eight of the levels used to calculate Mr. Dorsey's guideline range – totaling an additional approximately 25 months – are cumulative offense characteristics. The base level offense for the statute under which Mr. Dorsey is convicted (18 U.S.C. §1956) is 8, but then he receives another 2-level enhancement for being convicted under that same statute; the definition of money laundering (thus inherent in the base level offense) includes that the

funds are the proceeds of unlawful activity, yet an additional 6 levels are added for some of the funds being proceeds of drug trafficking. These factors are slightly different versions of the same concept; all "closely correlated" with each other. *See* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170, (2008).

These enhancements act like mirrors reflecting mirrors, creating an illusion of greater culpability, when, in fact, each enhancement is largely an alternative measure of the same conduct. *See id*. "In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." *Id*. "The result is that many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so at the top of the sentencing table where sentencing ranges are wide[.]" *Id*. *See also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L. Rev. 1611, 1648-49 (2007); Alan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011) ("[m]ultiple, overlapping enhancements also have the effect of 'double counting' in some cases," while "the guidelines fail to take into account important mitigating offense and offender characteristics.").

The Commission itself has acknowledged this problem of "factor creep," as "more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 137 (2004);[5] *see, e.g., United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *Booker*) (upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (guidelines in security fraud cases "are patently absurd on their face" due to the "piling on of points" under § 2B1.1) (citing *Adelson*, 441 F. Supp. at 515).

If Mr. Dorsey's guidelines were calculated without the additional eight levels of cumulative offense characteristics, his offense level would be 13 (base level offense of 8 plus 8 for loss amount, minus 3 for acceptance). At criminal history category II, the guidelines range would be 15-21 months. At a category I, the range would be 12-18 months. Mr. Dorsey asks that the Court consider the substantial effect that the cumulative offense characteristics imposes on his guidelines range when fashioning the appropriate sentence in his case.

---

[5] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf

**E.    A sentence of time-served with supervised release to include 200 hours of community service fulfills the need to protect the public, promote respect for the law, and provide just punishment and deterrence.**

"Probation is not an act of leniency. Probation is a substantial restriction of freedom; it is not forgiveness, and it is not an endorsement of the offense." *United States v. Myers*, 353 F. Supp. 2d 1026, 1032 (S.D. Iowa 2005)(citation omitted). "Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001)(citations and internal quotations omitted); *see also Gall v. United States*, 552 U.S. 38, 48 n.4 (2007); ("Probation is not granted out of a spirit of leniency. . . . As the Wickersham Commission said, probation is not merely 'letting an offender off easily'") (citing Advisory Council of Judges of National Council on Crime and Delinquency, *Guides for Sentencing* 13-14 (1957). Thus, in requesting a time-served sentence with supervision, Mr. Dorsey is not asking to simply to be let go or to not be held accountable. Supervision is still intrusive and punitive. Moreover, Mr. Dorsey has already served over a year incarceration.

A sentence of time-served with three years of supervised release to include 200 hours of community service also advances the goals of specific deterrence. Mr. Dorsey has been significantly punished and deterred from any future criminal conduct. He has missed over a year of his daughter's life and it has crushed him. He lost the ground he had been gaining in his new job, and the prospect of its higher hourly pay. He now has to start anew, a

financial struggle in an expensive city. Mr. Dorsey has disappointed his family and lost that innocent admiration possessed at one time by his only child. He lives knowing his daughter now views him as not the father she thought she had. That, perhaps, is the harshest punishment of all.

Finally, as the Second Circuit noted, a defendant who has previously been sentenced to minimal incarceration, (in Mr. Dorsey's cases, no previous incarceration) might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by a lengthy sentence. *See United States of America v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001).

Not only has Mr. Dorsey already been significantly punished and deterred, but further incarceration would actually increase the risk of recidivism, not decrease it. Sending Mr. Dorsey to out to a BOP facility at this point would have the exact opposite effect of benefiting society; it would be to the detriment of the community. Each of these positive changes and relationships that Mr. Dorsey has worked hard to build in the past year would be in jeopardy. The longer Mr. Dorsey is away, the harder it is to maintain the bonds he has built that will ultimately keep him on his path to success. If the ultimate goal for Mr. Dorsey is for him to be a reformed, contributing member of society who recognizes his past poor decisions, that goal has already been achieved. Removing him from the circle of positive support he has, weakens Mr. Dorsey's chance at continued success and

furthers none of the ultimate goals of sentencing. To help promote deterrence,

is important that defendants "maintain their ties to family, employers, and

their community, all of which promote successful reentry into society.

Conversely, when prisoners serve longer sentences they are more likely to

become institutionalized, lose pro-social contacts in the community, and

become removed from legitimate opportunities, all of which promote

recidivism." Wright, Valerie, *Deterrence in Criminal Justice: Evaluating*

*Certainty v. Severity of Punishment*, Sentencing Project, 7 (2010)[6]

Both specific and general deterrence in the criminal justice context are

primarily achieved through the act of being caught, not through lengthy

prison sentences. Research has proven this axiom time and time again. *See*

*United States v. Courtney*, 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M. 2014) ("An

avalanche of criminological studies have determined that this theoretical

symmetry between severity of punishment and certainty of detection does not

---

[6] available at https://webpage.pace.edu/jhumbach/Crim-
SentencingProject%20ReportonDeterrence.pdf.

exist in the real world.").[7] "[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion. (Blumstein, Cohen, and Nagin 1978; Blumstein, Cohen, Roth, and Visher 1986; Reiss and Roth 1993), as has every major survey of the evidence

---

[7] For support on this point, *Courtney*, 76 F. Supp. 3d at n.13 cites the following studies and research:

Isaac Ehrlich, *Participation in Illegitimate Activities: A Theoretical and Empirical Investigation*, 81 J. Pol. Econ. 521, 544-47 (1973)(finding that the certainty of punishment was a more important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, *The Deterrent Effect of Perceived Severity of Punishment* 59 Soc. Forces 471, 472 (1980)(reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process"); Jeffrey Grogger, *Certainty v. Severity of Punishment* 29 Econ. Inquiry 297, 304 (1991)(studying California arrestees and concluding that "increased certainty of punishment provides a much more effective deterrent than increased severity" and that a "six percentage point increase in average conviction rates would deter as many arrests as a 3.6 month increase in average prison sentences"); Steven Klepper & Daniel Nagin, *The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited*, 27 Criminology 721, 741 (1989)(surveying graduate students about tax evasion scenarios and finding that certainty of punishment is an effective deterrent); Daniel S. Nagin, *Criminal Deterrence Research at the Outset of the Twenty-First Century*, 23 Crime & Just. 1, 13 (1998)(reviewing the literature and concluding that "cross-sectional and scenario-based studies have consistently found that perceptions of the risk of detection and punishment have negative, deterrent-like associations with self-reported offending or intentions to offend"); Daniel S. Nagin & Greg Pogarsky, *An Experimental Investigation of Deterrence: Cheating, Self-Serving Bias, and Impulsivity*, 41 Criminology 167 (2003)(testing whether students would cheat on a trivia quiz to earn a cash bonus and finding that cheating decreased when the certainty of detection was higher but not when the perceived severity of punishment increased); Ann Dryden Witte, *Estimating the Economic Model of Crime with Individual Data*, 94 Q. J. Econ. 57, 79 (1980)(studying men released from the North Carolina prison system and demonstrating that "a percentage increase in the probability of being punished has a relatively larger effect on the number of arrests or convictions than does a percentage increase in the expected sentence"); Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* 47 (1999); Robert Apel & Daniel S. Nagin, *General Deterrence: A Review of Recent Evidence, in Handbook on Crime and Criminal Justice* (Michael Tonry ed.)(2011); Alfred Blumstein & Daniel Nagin, *The Deterrent Effect of Legal Sanctions on Draft Evasion*, 29 Stan. L. Rev. 241, 269 (1977)(studying draft evasion and finding a significant negative association between the probability of conviction and the draft evasion rate, leading the authors to conclude that their "findings are consistent with the work of other investigators who have argued that the certainty of punishment has a stronger deterrent effect on crime than the severity of punishment"); Aaron Chalfin & Justin McCrary, *Criminal Deterrence: A Review of the Literature*, 55(1), 5–48 J. Econ. Literature (2017)

(Cook 1980; Nagin 1998, 1999; von Hirsch et al. 1999; Doob and Webster 2003)." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28- 29 (2006). "The weight of the research indicates that incarceration -- imposing it at all or increasing the amount imposed --either has no significant correlation to recidivism or *increases* the defendant's likelihood to recidivate.")(emphasis in original). *Courtney*, 76 F. Supp. 3d at 1304 n.13 (D.N.M. 2014).[8]

Even the Sentencing Commission itself acknowledged this fact. "There is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004). And perhaps most notably, the Department of Justice has tacitly acknowledged this fact,

---

[8] For support on this point, *Courtney*, 76 F. Supp. 3d at n.13 cites the following studies and research:

Lin Song & Roxanne Lieb, *Recidivism: The Effect of Incarceration and Length of Time Served* 4-6, Wash. St. Inst. for Pub. Pol'y (Sept. 1993), available at http://wsipp. wa.gov/ReportFile/1152/Wsipp_Recidivism-The-Effect-of-Incarceration-and-Length-of-Time-Served_Full-Report.pdf (summarizing available studies on the correlation between incarceration and recidivism); T. Bartell & L.T. Winfree, *Recidivist Impacts of Differential Sentencing Practices for Burglary Offenders*, 15 Criminology 387 (1977)(outlining the results of a New Mexico-based study and concluding that offenders placed on probation were less likely to be reconvicted than similarly situated offenders who were incarcerated); D.M. Gottfredson, M.G. Neithercutt, J. Nuttfield & V. O'Leary, *Four Thousand Lifetimes: A Study of Time Served and Parole Outcomes, Nat'l Council on Crime & Delinquency* (1973)(outlining the results of a study of over 100,000 male parolees and finding that similarly situated offenders who served longer periods of incarceration were more likely to recidivate than those who received shorter periods of incarceration); T. Orsagh & J.R. Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, 4 J. Quant. Criminology 155 (1988)(concluding that similarly situated robbery convicts' recidivism rates rose with rising length of incarceration, while burglars and some other criminals had a "sweet spot" length of incarceration -- 1.2 to 1.3 years for younger offenders and 1.8 years for older offenders -- deviations from which increased recidivism); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes* 33 Criminology 587 (1995).

"[C]onfinement or increased length of incarceration served the crime control purpose of incapacitation but had little or no effect as a 'treatment' with rehabilitative or specific deterrent effects" Don M. Gottfredson, U.S. Department of Justice, National Institute of Justice, *Effects of Judges' Sentencing Decisions on Criminal Cases*, Research in Brief 9 (Nov. 1999). Based on all these reasons and findings, the significant deterrent effect in Mr. Dorsey's case has already been achieved because he was caught. Neither specific nor general deterrence increases further with the length of sentence later imposed.

To the extent general deterrence could be achieved, its purpose will be served by a sentence of time-served with three years of supervision to included 200 hours of community service. The 200 hours of community service will get Mr. Dorsey out into society, to keep him accountable in the public where he is able to further a positive message upon others.

The people following Mr. Dorsey's situation most closely are not individuals out in the community who are contemplating selling drugs or engaging in money laundering. Without a doubt, the people most aware and interested of the outcome of Mr. Dorsey's case are other inmates at the D.C. jails. Those are the individuals to whom any messaging most reaches. A sentence of time service with three years of supervision sends a message to others there that if they accept responsibility, rise above the fray, and make all considerable efforts to turn their lives around even under difficult

29

circumstances at the jail, it will be recognized. Seeing another person's

dedication yield results is inspiring to others—a principle that is true in

many contexts. As a community, it serves the public interest for these

individuals at the D.C. jail who, at one point or another will likely return to

society, to find in Mr. Dorsey's story, motivation to make their own changes,

having been provided a concrete example, through Mr. Dorsey's sentencing,

that hard work and dedication has value.

## CONCLUSION

Mr. Dorsey has shown that he has recognized his poor choices,

accepted responsibility for them, suffered severe consequence, and done

everything he possibly can to right his wrongs. The goals of sentencing,

including deterrence, will be achieved by a time-served sentence with 200

hours of community service. Mr. Dorsey is poised to reintegrate and succeed;

he has the momentum, the support, and the perseverance. He asks this

Honorable Court to for that chance now to begin anew.

Respectfully submitted,
RONALD LYNN DORSEY
By Counsel
_____/s/_____
Jessica N. Carmichael, DC Bar No. 998952
CARMICHAEL ELLIS & BROCK, PLLC
108 N. Alfred Street, First Floor
Alexandria, Virginia 22314
(703) 684-7908
jessica@carmichaellegal.com